UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
LAUREN LEWIS,

        Plaintiff,

       -against-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.
--------------------------------x

9/20/13

**REPORT & RECOMMENDATION**

11 Civ. 7538 (JPO)(MHD)

TO THE HONORABLE J. PAUL OETKEN, U.S.D.J.:

Plaintiff Lauren Lewis has filed this pro se action pursuant to section 205(g) of the Social Security Act ("the Act"), as amended, 42 U.S.C. § 405(g), to challenge the final decision of the Social Security Administration ("SSA") denying her application for a period of disability, disability insurance benefits, and Supplemental Security Income benefits under Title II and Title XVI of the Act. Plaintiff claims that she has been disabled since August 27, 2007, as a result of a wide range of ailments. Defendant, the Commissioner of Social Security ("Commissioner"), has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff has also moved for judgment in her favor, arguing for a reversal of the final decision of the Commissioner.

For the reasons below, we recommend that the case be remanded to the SSA for further consideration of the record.

I.  **Procedural History**

Plaintiff filed her dual Title II and Title XVI applications with the SSA on February 6, 2008. (Admin. R. Tr. ("Tr.") at 15, 31, 32). She claimed to be disabled based upon her "difficulty relating adequately with others and appropriately dealing with stress." (Pl. Mem. 2). On June 2, 2008, the SSA wrote to inform plaintiff that her applications had been denied and that, as a result, she was not entitled to receive benefits. (Tr. 15, 33-40). On July 7, 2008, plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (Id. at 15). The initial hearing was held before ALJ Harvey Feldmeier on August 27, 2008, in Brooklyn, New York. (Id. at 15, 352, 354-95). On February 10, 2009, the ALJ continued the hearing in order to "give [plaintiff] the opportunity to come back and comment on" additional information that he had received. (Id. at 15, 388, 394, 396, 398-409). Plaintiff appeared without an attorney at both hearings. (Id. at 354, 398).

On February 25, 2009, the ALJ issued a decision finding that, for purposes of the Act, plaintiff was not disabled, and therefore was not entitled to receive benefits. (Id. at 12, 15-20). On April 28, 2009, plaintiff filed an appeal with the SSA, requesting that the Appeals Council review the ALJ's decision. (Id. at 11). On April 4, 2011, the Appeals Council denied plaintiff's request to review the ALJ's decision. (Id. at 8). Plaintiff reported to the SSA that she had never received a copy of the Appeals Council's decision (id. at 7), and accordingly on October 7, 2011, the SSA extended the time within which plaintiff was permitted to file a civil action with this court contesting the adverse ruling in her case. (Id. at 3). This suit followed.

## II.  **Personal History**

Plaintiff was born on April 24, 1981, in Trinidad, West Indies. (Id. at 363). She was raised and attended school in Trinidad until 1991, when, at the age of ten, she moved with her father and brother to join her mother in the United States. (Id. at 255, 363). Plaintiff's family settled in Brooklyn. (Id. at 255). She became a naturalized United States citizen in October 2006. (Id. at 363).

3

Plaintiff received her high school diploma but did not immediately attend college. (Id. at 338). Instead, from 2001 until 2004, she worked "off and on" as a cashier and salesperson at a clothing store in the Flatbush section of Brooklyn. (Id. at 97, 104, 371). While working in retail, plaintiff was certified as a Medical Assistant in December 2003 and received a vocational training certificate in 2004. (Id. at 369, 370). Plaintiff's training was in "hospitality and tourism . . . small business management, hotels, travel agencies, almost anything to do with the public." (Id.).

In 2005, plaintiff switched occupations and began working in the field of education. She served as an Academic Team Director at the Harlem Children's Zone ("HCZ") until early 2007 and at Groundwork for the Youth ("GFY") until August 2007. (Id. at 104, 370-74). One of plaintiff's roles at HCZ was as a teacher's assistant, where she worked with teachers in the classroom during the day to help conduct class. (Id. at 373-74). Among other duties, plaintiff worked with groups of students, administering spelling tests, going over vocabulary words, correcting paperwork, and checking homework and tests. (Id.). At both HCZ and GFY, plaintiff taught and tutored at after-school and summer programs, where she formulated, prepared,

implemented, and conducted lessons. (Id. at 104, 105, 245, 370-74). In addition to the close supervisory contact with children inherent in her position, plaintiff reported that she was called upon to supervise nine to twelve adults. (Id. at 98).

In 2006, while continuing to work at the summer and after-school programs, plaintiff gave up her role as a teacher's assistant in order to go back to school. She attended Medgar Evers College in Brooklyn, where she was a double-major in special education and social work. (Id. at 245).

In 2007, after completing thirteen credits at Medgar Evers, plaintiff dropped out. (Id. at 102, 233, 238, 369). She made the decision to leave school because she felt overwhelmed and could not cope with the stress, particularly around the time of exams. (See id. at 244). Additionally, on August 27, 2007, plaintiff lost her job at GFY, reportedly due to a personality clash with her supervisor. (Id. at 383).

Finally, on September 8, 2007, plaintiff moved out of her home in Brooklyn and into New Providence Women's Shelter ("New Providence"), a homeless shelter in Manhattan. (Id. at 74, 100, 233, 354-55, 364). Plaintiff was compelled to seek out a new

5

home because her mother and brother, with whom plaintiff was living, were physically abusing her. (Id. at 189, 234). Plaintiff was unhappy living at New Providence (id. at 190, 212, 213, 216), and on September 5, 2008, she moved to Susan's Place, a new shelter in the Bronx. (Id. at 406-407).


III. **Medical Treatment**


A. **Prior to Onset Date of August 27, 2007**


1. **Brooklyn Center for Psychotherapy**


In the fall of 2006, plaintiff began treatment at the Brooklyn Center for Psychotherapy ("BCP"). (Id. at 251-58). On September 11, 2006, she completed an Intake Assessment and Evaluation form (id.), providing BCP with her medical, personal, and family history. (Id. at 251, 254-56). Plaintiff reported having asthma and experiencing migraines, denied any significant developmental milestones and family illnesses, and denied any psychiatric history. (Id. at 254). Plaintiff also reported that she had been raped on five different occasions by the time she was twenty years old (id. at 256), three times by a significant

6

other (id.), and that as a result she suffers from Post Traumatic Stress Disorder ("PTSD"). (Id.).

The Intake Assessment and Evaluation form also provided BCP with a description of plaintiff's current symptoms. (Id. at 253-54). She reported experiencing sleep disturbances, sleep walking, and sleep talking; anxiety; and worrying/ruminations. (Id.). Plaintiff also indicated that she "doesn't eat enough" because she is obese. (Id. at 253).

Finally, plaintiff described her specific reasons for seeking treatment. She reported that while she had experienced depressive symptoms for much of her life, she became deeply depressed at times when taking "Slimquick" diet pills, which "messed with [her] hormones." (Id. at 252). The adverse effects of these pills, when combined with her "anxiety problem," inability to sit still, and other ailments, led her to pursue medical assistance. (Id. at 252). The form briefly detailed treatment goals and the initial treatment plan, which included psychiatric evaluation. (Id. at 257-58).

On October 6, 2006, Dr. L. Derose completed a Mental Status Evaluation of plaintiff. (Id. at 245-48). At the outset of the

evaluation, plaintiff reported having periodic episodes of depression since her preteen years. (Id. at 245). Dr. Derose found that plaintiff "had suicidal thoughts, difficulty falling asleep, and staying asleep" after taking Slimquick. (Id. at 245). The evaluation also mentioned that plaintiff had been prescribed Topamax by her neurologist to combat migraines,[1] but that the medication caused plaintiff to suffer from diarrhea and become dehydrated, dizzy, and depressed, and that she had therefore stopped taking it. (Id.).

Dr. Derose noted that plaintiff was cooperative, engaged, and alert, and displayed fair intellectual functioning, attention, and concentration during the session. (Id.). The doctor noted that plaintiff's speech was clear, coherent, logical, and relevant; her judgment and impulse control were fair; and there was no evidence of a formal thought disorder or delusion. (Id. at 245-46). Dr. Derose further noted that plaintiff's mood was irritable and her affect dysphoric, and that she displayed only partial insight. (Id.). Under the five-

---

[1] The documents in the administrative record do not indicate when the Topamax medication was prescribed, nor do they indicate the identity of the prescribing neurologist.

axis diagnostic model,[2] Dr. Derose listed a major depressive disorder and PTSD on Axis I, migraines and asthma on Axis III, a history of being raped on Axis IV, and a GAF score of 58 on Axis V.[3]

In mid-October 2006, plaintiff began psychiatric treatment with C. Moldow, a Licensed Master Social Worker ("LMSW") at BCP, but only had two sessions with Moldow before transferring to LMSW Jacqueline Williams. (Id. at 250). In summarizing plaintiff's affect in the paperwork documenting the transfer, Moldow noted that plaintiff felt overwhelmed at school and vulnerable at work. (Id.). Plaintiff transferred because she was unable to attend 9 a.m. therapy sessions due to school

---

[2] This style of diagnosis reflects the use of the DSM model published by the American Psychiatric Association. See Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 27 (4th edition Text Revision 2000). Axis I refers to clinical disorders; Axis II refers to personality disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental contributing factors; Axis V refers to a Global Assessment of Functioning (GAF).

[3] A patient's GAF score quantifies symptoms according to a hypothetical continuum of mental-health illness. A score in the 51-60 range corresponds to "Moderate Symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." See https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf, last visited June 19, 2013.

obligations, and Moldow was unable to accommodate plaintiff's desired appointment times. (Id.).

Plaintiff met with Williams for counseling eight times over the next four months. (Id. at 244). In a Quarterly Update of Treatment Plan ("Quarterly Update") covering November 2006 through February 2007, Williams noted that in their sessions plaintiff talked at length about her relationship with her boyfriend and about getting attention and affection. (Id. at 249). Plaintiff also discussed how she felt rejected by her mother. (Id.). Williams assessed plaintiff's rate of progress during the quarter in question at 1 out of 5, the lowest level of progress possible. (Id.). In the transfer summary dated February 9, 2007, prepared following their last session together, Williams noted that plaintiff was open about her feelings of depression and anxiety, and struggling with her relationship with her boyfriend, her job, and her ability to manage school, especially around exams. (Id. at 244).

Plaintiff transferred to Licensed Clinical Social Worker ("LCSW") Helen Reiss on February 21, 2007 because Williams was leaving the BCP practice. (Id. at 233, 244). In a Quarterly Update presumably based on this first session, Reiss found that

plaintiff was stable in school and employment and that she demonstrated decreased anxiety and depression, some resolution of trauma history, and improved relationships. (Id. at 240). Reiss diagnosed plaintiff with a major depressive disorder and PTSD on Axis I, migraines and asthma on Axis III, and a GAF score of 58 on Axis V. (Id. at 241).

Reiss' next Quarterly Update covered the months of March, April, and May 2007. The Quarterly Update reported that plaintiff's attendance was inconsistent; when plaintiff did show up to counseling sessions, she was open about some topics but shied away from strong, difficult emotions and externalized often. (Id. at 238). Reiss noted that plaintiff had poor judgment with respect to her relationships with men, but had some dependable relationships with females. (Id.). She further noted that plaintiff was "out of touch with her own level of barely-suppressed rage" and "with the ways she sabotaged her own progress." (Id.). Reiss assessed plaintiff's rate of progress during the quarter in question at 2 out of 5, indicating that plaintiff was making some low level of progress toward reaching her treatment goals and recommendations. (Id.). The five-axis diagnosis for the relevant time period remained unchanged. (Id. at 239).

The Quarterly Update covering June, July, and August 2007 indicated that plaintiff maintained the same low level of progress in the third quarter of 2007 that she did in the second quarter. (Id. at 236). While the DSM diagnosis pegged plaintiff's GAF score at 58 for this quarter, in Reiss' estimation plaintiff's GAF score was 50.[4] (Id. at 237).

### B. Medical Evidence During the Post-August 27, 2007 Time Period: August 27, 2007-September 30, 2009

#### 1. BCP

Plaintiff lost her position as an Academic Team Leader during the third quarter of 2007. (Id. at 66). Less than two weeks later, she moved out of her home and into the New Providence Women's Shelter ("New Providence") in Manhattan. (Id. at 364). During this time she continued to obtain treatment and attend counseling sessions at BCP. (Id. at 233-35, 260).

---

[4] A GAF score of 50 corresponds to "Serious Symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." See https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf, last visited June 19, 2013.

In the Quarterly Update covering September, October, and November of 2007, Reiss noted that plaintiff's attendance was very poor since moving into the shelter. (Id. at 234). Despite her truancy, plaintiff repeatedly stated that she wished to continue receiving treatment at BCP. (Id.). Reiss reported that plaintiff had poor insight, seemed to engage in conflicts, and dwelled on the details of these conflicts rather than taking steps to improve her situation. (Id.). Williams assessed plaintiff's rate of progress during the quarter in question at 1 out of 5, the lowest level of progress possible. (Id.). Once again Reiss estimated plaintiff's GAF score at 50, while the DSM diagnosis placed plaintiff's GAF score at 58. (Id. at 235).

On December 8, 2007, after reviewing plaintiff's record and circumstances, BCP terminated plaintiff's care and recommended referring her to another care center closer to her shelter. (Id. at 233). The rationale for the referral given in the Termination Summary prepared by Reiss was plaintiff's continued poor attendance at counseling and therapy sessions since moving to Manhattan. (Id.). Reiss also noted that over the course of the treating relationship, which lasted from February 2007 until December 5, 2007 (id.), plaintiff's borderline traits had become more and more evident and her condition had worsened. (Id.).

13

Reiss diagnosed plaintiff at termination with a major depressive disorder and PTSD on Axis I, Borderline Personality Traits on Axis II, migraines and asthma on Axis III, living in a shelter and family violence on Axis IV, and a GAF score of 50 on Axis V. (Id. at 233, 235).

### 2.  Woodhull Medical Center

#### a.  Intake Screening

On January 22, 2008, plaintiff presented herself at Woodhull Medical Center ("Woodhull") for an initial assessment of her health and condition. (Id. at 188). Plaintiff reported that she was living in a shelter and that she felt stressed as a result. (Id.). Plaintiff communicated her past medical history to Maria Ramirez, who supervised plaintiff's intake. That history included diagnoses of Bipolar Disorder, OCD, PTSD, and claustrophobia, (Id.). Plaintiff reported that at age ten, she once attempted to stop a migraine by taking two whole bottles of Tylenol and one bottle of aspirin. (Id. at 189). Plaintiff also reported that she has headaches, crying episodes, difficulty sleeping, and occasional suicidal thoughts. (Id.).

14

Finally, plaintiff reported several instances in which she had exhibited suicidal behavior. Plaintiff stated that in January 2008, she had tried to hurt herself by walking out into traffic, and that several times she had tried going out too far into the water at the beach with the intent to drown herself. (Id.). On January 28, 2008, after reviewing the notes from the screening assessment, Ramirez assigned plaintiff's case to LCSW Eleanor Mendzies for therapy purposes. (Id.). Dr. Luis Monge became plaintiff's treating physician-psychiatrist. (Id. at 198, 199). Plaintiff saw Mendzies and Monge concurrently throughout 2008. (Id. at 196-228).

### b.  **Eleanor Mendzies**

Plaintiff first met with Mendzies for therapy on February 4, 2008. (Id. at 190). Plaintiff reiterated that she was experiencing stress as a result of living in the shelter system, which was exacerbated by shelter employees' lack of trust in plaintiff's statements that she could not engage in a lot of activities. (Id.). Plaintiff also told Mendzies that she suffered from seizures. (Id.).

Plaintiff was scheduled to meet with Mendzies on March 3, 2008, but did not show up for her appointment. (Id. at 192). She kept her next appointment, on March 31, 2008, and despite her stating that she felt fine, Mendzies found that plaintiff was in a low, sad mood. (Id. at 210). After plaintiff's session with Mendzies, she was examined by Stella Vilceus, a nurse at Woodhull, for a chemical dependency health assessment, and was formally admitted into the Woodhull outpatient treatment and therapy program. (Id. at 205, 210-11, 222-23).

Plaintiff and Mendzies next met on April 14, 2008. Mendzies' notes from the session were sparse, but indicate that plaintiff was still unhappy with life in the shelter and complained about conflicts and restrictive rules at New Providence. (Id. at 212).

Plaintiff returned for another session with Mendzies two weeks later. (Id. at 213). Once again the session focused on plaintiff's frustrations with life in the shelter. She reported that she was sharing a room at the shelter with two roommates, one of whom had poor hygiene and the other of whom masturbated all the time. (Id.). Plaintiff noted that she was trying to get her room changed in order to get away from these roommates.

16

(Id.). Mendzies wrote that plaintiff was able to effectively vent some of her feelings of frustration during the session. (Id.). Plaintiff also reported feelings of depression. (Id.).

Plaintiff returned to Woodhull for another session with Mendzies on May 12, 2008. (Id.). While Mendzies noted that plaintiff was in a stable mood, plaintiff continued to complain about her life in the shelter. (Id.). She reported breaking the rules in the shelter by selling cigarettes to make some money. (Id.). Plaintiff explained that she had no choice but to remain in the shelter because her mother and brother, whose abuse was the reason she had initially sought shelter, were "against her", and her supportive uncle did not have space for her in his home. (Id.). Amid this discussion, Mendzies observed that plaintiff had poor insight and appeared to be angry at her. (Id.).

Plaintiff's next session with Mendzies occurred on June 2, 2008. (Id. at 214). Mendzies encouraged plaintiff to reflect on what Mendzies considered to be "attention seeking" behavior from the previous session. (Id.). Plaintiff responded by complaining that she believes that people are always picking on her and that she gets the same result every time in life, even when she tries not to get attention. (Id.). Mendzies noted that plaintiff was

17

"terrified" during the session and did not want to discuss any of the materials that Mendzies provided her on the symptoms of depression and Bipolar Disorder. (Id.). Finally, the parties discussed plaintiff's request that Mendzies fill out a psychiatric evaluation to give to shelter officials so that plaintiff could apply for alternative housing. (Id.).

Plaintiff and Mendzies were scheduled to meet again on June 16, 2008, but plaintiff called to reschedule. (Id. at 216). Plaintiff also called to reschedule her June 30, 2008, appointment with Mendzies. (Id.).

Plaintiff kept her next appointment on July 7, 2008. (Id.). She reported that she had had a flashback; after some prompting, plaintiff told Mendzies that the flashback involved her drowning. (Id.). Plaintiff then clarified that she had woken up feeling as if she were drowning. (Id.). She was unsure about what this flashback meant. (Id.). The parties also discussed plaintiff's ongoing efforts to find new housing, as plaintiff continued to struggle with obtaining necessary paperwork and dealing with the entire housing-application process. (Id.). Plaintiff resolved to continue to push forward with her efforts to get out of the shelter system. (Id.). Mendzies also confirmed

that plaintiff was continuing to take all of her prescribed medication and got plaintiff to indicate her continued agreement to abide by the Treatment Plan (Id.).

The next session was scheduled for July 28, 2008, but on July 21, 2008, plaintiff called to request a meeting that very day. (Id. at 218). Mendzies apparently could not accommodate plaintiff's request. (Id.). Plaintiff ended up calling to cancel the July 28 appointment. (Id.).

Plaintiff did not meet with Mendzies again until September 8, 2008. (Id. at 218). In the interim, she had appeared before ALJ Feldmeier for her initial hearing and moved to a new shelter in the Bronx. (Id. at 354-95, 406-07). At the therapy session, plaintiff informed Mendzies of her move and complained about the lack of notice by New Providence with respect to her move, for plaintiff had been told to pick up, pack, and move out straight away. (Id. at 218). Plaintiff informed Mendzies that she wanted to transfer to a new Social Worker because she felt that Mendzies did not care about her. (Id. at 219). Plaintiff and Mendzies also discussed the long distance plaintiff needed to travel from the Bronx to Brooklyn in order to receive care; plaintiff indicated that she would explore being referred to a

mental health clinic in the Bronx closer to her new shelter. (Id.).

Plaintiff and Mendzies met again on September 22, 2008, but plaintiff called to cancel her October 6, 2008 appointment. (Id. at 220). In a Treatment Plan Review filed on October 9, 2008, Mendzies noted that plaintiff was still continuing to pursue the objectives set forth in the Plan. (Id. at 197). Plaintiff failed to show up for her session on October 20, 2008, and did not call to cancel. (Id. at 220).

### c. **Dr. Luis Monge**

Plaintiff saw Dr. Monge for medical and psychiatric examinations and checkups while she was being treated by Mendzies for therapeutic purposes. Plaintiff's first visit to Dr. Monge took place on April 8, 2008 (id. at 199), after she had been formally accepted into Woodhull's program. (Id. at 205). Dr. Monge found that plaintiff had a cooperative attitude, clearly goal-directed speech, fair attention and concentration, intact short term memory, average intelligence, neutral mood, and poor sleep patterns. (Id.). Dr. Monge also found that plaintiff was anxious and claustrophobic, and had visual

20

illusions. (Id.). In Dr. Monge's initial findings he diagnosed
her with Bipolar Disorder and PTSD on Axis I; obesity, asthma,
back problems, and migraines on Axis III; lack of employment,
difficulty in interpersonal relationships and family matters on
Axis IV; and a GAF score of 50 on Axis V. (Id.).

Plaintiff saw Dr. Monge again on April 23, 2008. (Id. at
212). Dr. Monge noted in his records that plaintiff was obese
and experienced back pain, that there was no evidence that
plaintiff was a danger to herself or to others, and that she was
resistive to discontinuing her use of Prozac or Lexipro. (Id.).
Dr. Monge further indicated that plaintiff was angry with her
roommates for their bizarre behavior and wanted the shelter
director to intervene on her behalf to improve the situation.
(Id.).

Plaintiff's next visit to Dr. Monge came on June 4, 2008.
(Id. at 215, 316, 319-20). During this visit, Dr. Monge
completed a psychiatric evaluation for Project Renewal, a job-
readiness and housing program at New Providence. (Id. at 316,
358). Dr. Monge noted that plaintiff was presenting symptoms of
depression, anxiety, loneliness, obsessiveness, and compulsive
behavior; that she was being treated for back pathology,

21

migraines, and asthma; and that she was relating to peers and family members poorly. (Id.). Dr. Monge wrote that plaintiff has had passive suicidal thoughts and leanings, has a history of being sexually molested by family members, and has been diagnosed with Bipolar Disorder in the past. (Id.).

Dr. Monge reported that plaintiff was alert and oriented to all spheres; cognitively well-rated; and able to concentrate, control her impulses, and give insight fairly well. He also noted that she was obese; speaking clearly with goals; in a depressive mood with a sad affect and underlying anger and irritability; and paranoid with phobias of being in closed places. (Id. at 319, 320). Dr. Monge diagnosed plaintiff with Bipolar Disorder and PTSD on Axis I; asthma, migraines, back problems, and arthritis on Axis III; and problems with interpersonal relationships with peers, authority figures, and family members on Axis IV. (Id. at 320).

In a Treatment Plan Review filed on July 7, 2008, Dr. Monge noted that plaintiff was still continuing to pursue the objectives set forth in the Plan. (Id. at 198).

22

Dr. Monge and plaintiff met again on July 16, 2008. (Id. at 217). The two discussed plaintiff's perception of her harassment by shelter peers and staff members, paranoid ideas, anxiety, and grandiosity. (Id.). Dr. Monge noted that plaintiff presented no evidence that she was a danger to herself or to others. (Id.).

On August 15, 2008, Dr. Monge saw plaintiff. The doctor reported after the visit that plaintiff was not suffering from any hallucinations. (Id.). At the visit's conclusion Dr. Monge also increased plaintiff's dosage of Seroquel. (Id.).

On September 12, 2008, Dr. Monge saw plaintiff and completed two evaluations. (Id. at 219, 226-28, 329-30, 331-33). The doctor reported that plaintiff presented no evidence that she was a danger to herself or to others, denied having hallucinations, and agreed once again to adhere to the Treatment Plan. (Id. at 219).

Dr. Monge first filled out a Treating Physician's Wellness Plan Report ("Wellness Plan Report") for plaintiff's public assistance program. (Id. at 329-30). In the "Current Diagnoses" section, Dr. Monge listed PTSD, Bipolar Disorder, and claustrophobic traits. (Id. at 329). Under "Relevant Clinical

23

Findings," Dr. Monge listed obesity, asthma, back pathology,[5] migraine headaches, visual illusions, re-experiencing past trauma, irritability, claustrophobia, poor impulse control and judgment, and obsessive thoughts. (Id.). Dr. Monge reported that plaintiff had made modest to moderate improvements in her depressive mood and hypomanic disorder, was experiencing interpersonal difficulties at the shelter, and was being seen at Woodhull for medication and psychotherapy. (Id. at 329, 330). In the "Functional Capacity" section, Dr. Monge checked off the "temporarily unemployable" box, writing underneath the checkmark that plaintiff "requires orthopedic work up for back pathology at this time." (Id. at 330).[6]

Dr. Monge next filled out the SSA's "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" ("Medical Source Statement") form. (Id. at 226, 331). The first question on the form asks "Is ability to understand, remember,

---

[5] The administrative record reflects an April 30, 2008 diagnosis of lower back spasms (id. at 157-60) and a May 28, 2008 visit to the emergency room for back pain (id. at 272), but it does not contain any records evidencing treatment for plaintiff's back pain.

[6] Dr. Monge's hand-written notes, in keeping with the stereotype of doctors' penmanship, are very difficult to read. We did our best to decipher the notes and capture Dr. Monge's important findings, but at times we were unable to do so.

and carry out instructions affected by the impairment?" (Id.). If the medical professional filling out the form answers in the affirmative, s/he is prompted to address five subsequent, specific sub-parts, each of which has five potential answer choices ("None," "Slight," "Moderate," "Marked," and Extreme") to indicate the extent of the impairment. (Id.). Dr. Monge noted that plaintiff was affected by her impairment, and further noted that plaintiff demonstrated "slight," or mild, limitations in her ability to "carry out detailed instructions". (Id.). Dr. Monge also noted that plaintiff's ability to "understand and remember short, simple instructions," "carry out short, simple instructions," "understand and remember detailed instructions;" and her "ability to make judgments on simple work-related decisions" all had no or minimal limitations ("none" on the impairment extent scale). (Id.). In support of his assessment, Dr. Monge said that plaintiff was being treated for back problems. (Id.).

The second question on the form, formatted identically to the first question, asks "Is ability to respond appropriately to supervision, co-workers, and work pressures in a work setting affected by the impairment?" (Id. at 227, 332). Dr. Monge noted that plaintiff was affected by her impairment, and further noted

25

that plaintiff demonstrated "moderate" limitations in her ability to "interact appropriately with supervisor(s)". (Id.). Dr. Monge also noted that plaintiff had "slight," or mild, limitations in her ability to "interact appropriately with the public," "interact appropriately with co-workers," "respond appropriately to work pressures in a usual work setting," and "respond appropriately to changes in a routine setting". (Id.). In support of his assessment, Dr. Monge said that plaintiff demonstrated "emotional instability and physical back problems". (Id.).

### 3. Post Graduate Center for Mental Health

In late October or early November 2008, plaintiff began going to the Social Rehabilitation Clinic of the Post Graduate Center for Mental Health ("Post Graduate") in Manhattan for treatment. (Id. at 21-23, 399-400). In December 2008, the treating psychiatrist at Post Graduate took plaintiff off her medication "cold turkey," resulting in three anxiety attacks and a visit to the emergency room. (Id. at 400). Several prescriptions written by Dr. Joseph Holmgren for plaintiff on February 2, 2009, are the most recent documents found in the medical record.

### 4. **Bellevue Hospital**

On December 18, 2007, plaintiff went to the emergency room at Bellevue Hospital ("Bellevue"), complaining of headaches. (Id. at 152, 180, 182-83). She also complained of chest pain, which she indicated was intermittent throughout the morning. (Id. at 182). Plaintiff told the physician on call that these chest pains felt like anxiety attacks that she had experienced in the past. (Id.).

On December 24, 2007, plaintiff returned to the emergency room at Bellevue, complaining of pain throughout her entire chest. (Id. at 152, 176-78, 305). The pain lasted for several hours and began while plaintiff was asleep. (Id. at 177). The physician on call noted that the pain was caused by anxiety, but that plaintiff's pain was atypical. (Id. at 177, 178).

On January 23, 2008, plaintiff visited the emergency room, seeking treatment for a migraine. (Id. at 152, 172-73, 298). Plaintiff was discharged with instructions to return if her

symptoms worsened and to follow up with her neurologist. (Id. at 173).[7]

On February 8, 2008, plaintiff returned to Bellevue, complaining of chest pain that had persisted since the morning. (Id. at 168-71, 312). Plaintiff was given prescriptions to treat her pain and advised to return to the emergency room if new symptoms arose. (Id.).

Plaintiff was seen at Bellevue's Department of Psychiatry on February 13, 2008, and on March 24, 2008. (Id. at 184-86, 280, 290, 300). During the latter visit plaintiff was given prescriptions for Prozac, Klonopin, and Seroquel. (Id. at 280).

Plaintiff was seen again at the Bellevue emergency room on April 28, 2008, for an abrasion (id. at 276) and on May 28, 2008, for back pain. (Id. at 272).

---

[7] We were unable to find any documentation evidencing visits to a neurologist in the administrative record. The only other mention of a neurological visit is found in plaintiff's October 6, 2006 Mental Status Evaluation, in which Dr. Derose noted that a neurologist had prescribed her Topamax in the past to treat migraines. (Id. at 245); see also n.1, supra. In addition, during plaintiff's hearing, she mentioned that she schedules appointments with her neurologist "as needed". (Tr. 387).

28

5. **Shelters**

a. **New Providence Women's Shelter**

While plaintiff was residing at New Providence, she was placed under the care of Dr. Terri Kaplan, the medical doctor at the shelter. (Id. at 359). Plaintiff testified that she saw Dr. Kaplan twice a month for the duration of her residency at the shelter (id. at 388), but the administrative record contains no documentation of these visits.

b. **Susan's Place**

In September 2008, after plaintiff moved to Susan's Place, her new shelter in the Bronx, she was placed under the care of Dr. Isaac Bampoe, the medical doctor at the shelter. (Id. at 24-30, 405). On December 4, 2008, after plaintiff had spent three months under his care, Dr. Bampoe filled out a Psychiatric Evaluation in which he assessed plaintiff's condition. (Id. at 24-28).

Dr. Bampoe first noted that plaintiff had undergone two years of psychiatric treatment, during which time she was

29

variously diagnosed with PTSD, major depression, OCD, and Bipolar Disorder. (Id. at 28). Dr. Bampoe also noted that while plaintiff was stable on her current medications, she reported frequent shifts in her mood from elation to being down and depressed. (Id.). Dr. Bampoe further noted that plaintiff was able to function well, was neither suicidal nor homicidal, and was free of psychotic symptoms. (Id.).

Dr. Bampoe noted that plaintiff was in an anxious mood; clear and coherent, relevant and logical; alert and oriented with fair concentration, impulse control, judgment, and insight; and free of delusions. (Id.). Dr. Bampoe concluded that plaintiff needed to continue her treatment with her psychiatrist but was able to safely function in the community. (Id.). He diagnosed plaintiff with Bipolar Disorder and PTSD on Axis I, and migraines and obesity on Axis III. (Id.).

### 6. **Arbor WeCARE**

On March 11, 2008, plaintiff was evaluated by a medical professional and intake specialists at Arbor WeCARE ("WeCARE"), a New York City Human Resources Administration ("HRA") public assistance program designed to help low-income clients with

medical and/or mental-health issues find employment.[8] The WeCARE staff prepared a Biopsychosocial Summary, a report detailing plaintiff's medical and psychiatric history and current medical and psychiatric status. (Tr. 335-51). We summarize the pertinent records below.

a. **Vivene Salkey**

Intake Specialist Vivene Salkey assessed plaintiff's current status. (Id. at 335-42). She noted that plaintiff suffered from severe anxiety, PTSD, manic depressive disorder, Bipolar Disorder, OCD, and claustrophobia. (Id. at 337). Salkey also noted that plaintiff, while adequately groomed, appeared to be in "mild distress." (Id.). Salkey placed plaintiff's depression severity at "moderate." (Id.).

Salkey posed a series of questions to plaintiff, each of which asked "over the last two weeks, how often have you been bothered by any one of the following problems?" (Id.). Plaintiff

---

[8] Per the HRA's website, the WeCARE program "addresses the needs of cash assistance clients with medical and/or mental health barriers to employment by providing customized assistance and services to help clients achieve their highest levels of self-sufficiency." See http://www.nyc.gov/html/hra/html/services/we_care.shtml, last visited August 19, 2013.

noted that "nearly everyday" during this time frame she was "feeling down, depressed, or hopeless." (Id.). Plaintiff said that on "more than half the days" of the past fortnight she had felt "little interest or pleasure in doing things"; had "trouble falling or staying asleep, or sleeping too much"; was "tired or ha[d] little energy"; "fe[lt] bad about [her]self or [thought] that [she is] a failure or [has] let [her]self or [her] family down"; and had "trouble concentrating on things . . . such as reading the newspaper or watching television." (Id.). On "several days" of the time period plaintiff reported "moving or speaking so slowly that other people could have noticed" and "being so fidget[y] or restless that [she] move[d] around a lot more than usual." (Id.). Plaintiff reported neither having a poor appetite nor overeating, and did not feel that she would be better off dead or hurting herself in some way. (Id.).

The final query from Salkey asked "how difficult have these problems made it for you to do your work, take care of things at home, or get along with other people?". Plaintiff's response was that it was "extremely difficult" to function. (Id.).

32

b.  **Josephina Urena**

Josefina Urena, an Intake Personal Care Assistant at WeCARE, ordered some standard laboratory tests and took plaintiff's vital signs and basic measurements. (Id. at 343). Plaintiff measured out at 70 inches tall (5' 10") and weighed in at 336 pounds. (Id.). With these height and weight figures, plaintiff's Body Mass Index was 48.2, putting her firmly in the "Obese" weight status category.[9]

c.  **Dr. Hazra Rahim**

Dr. Hazra Rahim, an internist at WeCARE, conducted a physical examination of plaintiff on March 11, 2008. (Tr. at 343-50). Dr. Rahim noted that plaintiff had had an abortion at one point (id. at 344) and that her vision in both eyes was abnormal with corrective lenses. (Id. at 345). Dr. Rahim found that plaintiff had asthma; musculoskeletal pain and tenderness in her neck, upper back, and scapula; depression; anxiety; symptoms of OCD; Bipolar Disorder; PTSD; insomnia; and violent

---

[9] Body Mass Index ("BMI") is a single number calculated from a person's height and weight that provides a reliable indicator of body fatness. A BMI in excess of 30 is considered "Obese." See http://www.cdc.gov/healthyweight/assessing/bmi/index.html, last accessed August 19, 2013.

impulses, noting in particular that plaintiff had "recently repeatedly banged her head to go unconscious." (Id. at 346, 347).

Following the exam Dr. Rahim wrote up a series of comments assessing plaintiff's status. She noted that plaintiff "would benefit from a structured, supervised outpatient day program" that gave her a "higher level of care" than an outpatient clinic, because of her intensity and need for "more structured treatment." (Id. at 349). Dr. Rahim suggested adding a mood-stabilizer to plaintiff's medication regime as a condition of treatment. (Id.).

Dr. Rahim also issued a series of final diagnoses: mood disorder, Bipolar Disorder, depressive disorder, PTSD, anxiety, borderline personality disorder, hyperlipidemia, back pain, bronchial asthma, and a latent tuberculosis infection. (Id.).

Finally, Dr. Rahim offered her assessment of plaintiff's employability. The doctor noted that plaintiff had "unstable medical and/or mental health conditions that require treatment (a wellness plan) before a functional capacity outcome can be made." (Id.). In support of this conclusion, Dr. Rahim noted

that plaintiff "is not sufficiently stable to participate in work activity and would be disruptive in a work setting at this point." (Id.). Dr. Rahim said that a "day program" was "the most appropriate level of care" and that plaintiff's "work suitability" would have been "difficult to assess until [plaintiff] is stabilized" in a program of this nature. (Id. at 349-50). Dr. Rahim noted that plaintiff's prognosis could improve significantly given the proper treatment because of her intelligence, and asked that plaintiff be referred back for evaluation in 90 days. (Id. at 349). There is no indication in the administrative record that this follow-up occurred.

IV. **SSA Consultants' Reports**

A. **Industrial Medicine Associates, P.C.**

On April 30, 2008, in the wake of plaintiff's benefits application, SSA referred her to Industrial Medicine Associates, P.C. ("IMA"). (Id. at 157). Plaintiff underwent both an internal-medicine examination and a psychiatric evaluation at IMA. (Id. at 157, 162).

### 1. **Dr. Rahel Eyassu**

Dr. Rahel Eyassu conducted plaintiff's internal medicine examination. (Id. at 157-61). In Dr. Eyassu's report, he noted that plaintiff has had exacerbated asthmatic symptoms since she was young and that she believes these symptoms are triggered by anxiety. (Id. at 157). The doctor noted plaintiff's history of migraines (which frequently come on around plaintiff's monthly menses), Carpal Tunnel Syndrome ("CTS"), back spasms, anxiety, Bipolar Disorder, and arthritis in her knees, wrists, and ankles.[10] (Id.). Dr. Eyassu also noted that plaintiff had recently sustained an injury to her right hand and wrist. (Id.).

Dr. Eyassu stated that plaintiff did not appear to be in any acute distress and that her gait, stance, skin and lymph nodes, chest and lungs, head and face, eyes, ears, nose, throat, neck, and heart all looked and functioned normally. (Id. at 158-59). However, Dr. Eyassu noted that plaintiff was experiencing a restriction in lumbar spine flexion, had a small laceration on the palm of the fifth finger and pain in her wrist and palm, and

---

[10] There is one mention in the administrative record of plaintiff being treated for migraines by a neurologist (id. at 245) and other sporadic references to plaintiff's back pain, see n.5, supra, but no record of treatment for Carpal Tunnel Syndrome or arthritis.

36

was unable to make a full fist in the right hand. (Id. at 159-60).

Dr. Eyassu then diagnosed plaintiff with asthma, migraines, CTS by history, arthritis, a recent right-wrist and hand injury, anxiety, and Bipolar Disorder. (Id. at 160). In a medical source statement to conclude the examination and summarize his findings, Dr. Eyassu stated that plaintiff had a mild limitation on bending and a mild limitation on carrying and lifting due to her hand injury. (Id.). Further, the doctor noted that plaintiff should avoid dust, fumes, and other respiratory irritants and pollutants. (Id.).

### 2. **Dr. Rita Haley**

Dr. Rita Haley undertook plaintiff's psychiatric evaluation at IMA on April 30, 2008. (Id. at 162-65). Dr. Haley's evaluation first reviewed plaintiff's background information and psychiatric and medical history before delving into her current functioning. (Id. at 162-63).

Dr. Haley noted that plaintiff claims to have difficulty falling and staying asleep, and that she awakens five to seven

37

times each night. (Id. at 163). Plaintiff reported that while she is sleeping, she is also conscious, and can prepare detailed lesson plans. (Id.). Plaintiff also reported to Dr. Haley that her moods vary and sometimes change several times a day; plaintiff has manic moods in which she is happy, feels very excited, and has large bursts of energy, but also has depressed moods in which she feels sad, has crying spells, and just wants to sleep the day away. (Id.). Plaintiff stated that in either mood she has difficulty concentrating, particularly because she has racing thoughts which limit her ability to focus. (Id.). Plaintiff also reported that despite her ailments she still has activities that she enjoys and that she is not socially withdrawn. (Id.).

During the examination, Dr. Haley noted that plaintiff was cooperative, related adequately, dressed casually, groomed adequately, and spoke clearly. (Id.). Plaintiff's mood and affect were pleasant; her sensorium was clear; her attention, concentration, and recent and remote memory skills were largely intact; her insight and judgment were fair; her cognitive functioning was average or above average; and her thought process, while showing some signs of grandiosity and possible delusions, was, for the most part, coherent and goal-directed.

38

(Id. at 164). Dr. Haley reported that plaintiff is able to dress, bathe, and groom herself, but that her anxiety escalates when she is attempting to navigate public transportation, and as a result she usually needs an escort when using the subway or the bus system. (Id.).

In a medical source statement to conclude the examination and summarize her findings, Dr. Haley wrote that in terms of plaintiff's psychological functioning, she can "follow and understand simple directions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, [and] learn new tasks." (Id. at 164-65). Dr. Haley noted that while plaintiff can make appropriate decisions, she "might need supervision to perform complex tasks [and] would have difficulty relating adequately with others and appropriately dealing with stress." (Id. at 165).

B. **Don O'Dell**

After plaintiff filed her application for disability and benefits, the SSA assigned her case to Don O'Dell, a Disability Examiner. (Id. at 125-30, 156). O'Dell completed a Physical Residual Functional Capacity Assessment to evaluate plaintiff's

condition on May 22, 2008 (id. at 151-56), eleven days before plaintiff's application was initially denied. (Id. at 15).

When assessing plaintiff's exertional limitations, O'Dell noted that she could occasionally lift and/or carry fifty pounds and frequently lift and/or carry twenty five pounds with no other limitations on pushing or pulling. (Id. at 152). O'Dell determined that plaintiff could stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday and sit with normal breaks for the same period of time per day. (Id.).

In the initial comments section of the Assessment, O'Dell reiterated and reproduced for his records some of plaintiff's medical history, hospital visits, and medical and psychological conclusions and diagnoses from doctors, therapists, and examiners. (Id.). Significantly, O'Dell noted that plaintiff had full range of motion in all extremities and her spine except for lumbar flexion to fifty degrees, with a complaint of back tightness. (Id. at 153). Plaintiff was unable to have an x-ray taken, possibly because of her excessive weight. (Id.).

40

O'Dell noted that plaintiff's sole postural limitation was her occasional difficulty in stooping and that her only environmental limitation was her need to avoid concentrated exposure to poorly-ventilated areas and air pollutants like fumes, dusts, odors, and gases. (Id. at 153-54). He noted that plaintiff had no manipulative, visual, or communicative limitations. (Id. at 154).

O'Dell recorded plaintiff's symptoms during the examination as back pain, asthma attacks, and migraine head pain. (Id. at 155). O'Dell said that some of these symptoms were related to the medically determinable impairments (MDIs) of asthma and migraines, but that others, namely plaintiff's back pain and knee pain, were not proportionate to the MDIs and were the result of mere wear and tear due to plaintiff's obesity. (Id.).

C. **Dr. E. Kamin**

On May 23, 2008, plaintiff was examined by Dr. E. Kamin, a state agency psychiatric medical consultant. (Id. at 131-48). Dr. Kamin checked off the box "RFC Assessment Needed" on his form, noting that plaintiff's Residual Functional Capacity ("RFC") would need to be calculated in order to determine

41

whether she was disabled. (Id. at 131). Dr. Kamin based this disposition on the presence of an Affective Disorder that did not "precisely satisfy the diagnostic criteria" given on the form. (Id. at 131, 34).

Dr. Kamin then rated plaintiff's functional limitation in various categories. He determined that plaintiff had a mild degree of limitation in the following areas: activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Id. at 141).

Next, Dr. Kamin assessed plaintiff's limitations and abilities for different mental activities. He determined that in "understanding and memory," plaintiff was not significantly limited. (Id. at 145). In the area of "sustained concentration and persistence," plaintiff's "ability to carry out detailed instructions" and "ability to work in coordination with or proximity to others without being distracted by them" were moderately limited. (Id. at 145). Dr. Kamin found that plaintiff was otherwise not significantly limited in this area. (Id. at 145-46).

Dr. Kamin similarly found that in the area of "social interaction," plaintiff's "ability to accept instructions and respond appropriately to criticism from supervisors" and her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes" were moderately limited. (Id. at 146). Plaintiff was otherwise not significantly limited in this area. (Id.).

Dr. Kamin found, under the activity of "adaptation," that plaintiff's "ability to travel in unfamiliar places or use public transportation" was moderately limited. (Id.). Plaintiff was otherwise not significantly limited in this activity. (Id.).

Dr. Kamin used the "Remarks" section of the form to comment on plaintiff's reported symptoms and ailments. Plaintiff alleged disability due to anxiety, Bipolar Disorder, and PTSD, and reported feeling as if she were being smothered or drowning. (Id.). Plaintiff reported that her PTSD manifested itself in flashbacks to the experiences of being raped, difficulty sleeping, and difficulty sleeping through the night. (Id. at 146-47). Plaintiff also reported that it was difficult for her to contain her anger. (Id. at 147). Dr. Kamin said these

43

observations indicated that plaintiff suffered from a mood disorder. (Id.).

Plaintiff also reported difficulty sleeping, waking frequently during the night, and difficulty with public transportation due to anxiety. (Id.). Dr. Kamin noted that plaintiff was casually dressed, adequately groomed, spoke clearly, had a pleasant mood and affect, was alert and oriented, had intact attention and concentration, and exhibited good memory. (Id.). The doctor further noted that plaintiff showed signs of grandiosity and delusions but was, for the most part, coherent, but he mentioned plaintiff's continued difficulty with public transportation due to her anxiety. (Id.). Dr. Kamin diagnosed plaintiff with a mood disorder, and remarked that plaintiff's prognosis was fair, as she was receiving medication and treatment. (Id.).

Dr. Kamin then provided his Functional Capacity Assessment. He concluded that plaintiff "has the capacity for understanding and following instructions, the ability to maintain concentration and a schedule. But may have difficulty working with others." (Id.).

V. **Testimony Before the ALJ**

A. **August 27, 2008 Hearing**

Plaintiff first appeared before ALJ Harvey Feldmeier on August 27, 2008, six months after filing an application for disability benefits and less than two months after requesting a hearing. (Id. at 15, 354). After the ALJ explained to plaintiff the benefits of proceeding with an attorney, plaintiff decided to proceed without representation. (Id. at 355-57). Plaintiff was placed under oath following a brief review of the documents already admitted into evidence. (Id. at 357-62).

The ALJ began by confirming certain details of plaintiff's personal history. (Id. at 362-64). Plaintiff noted that she stands 5'10" and weighs somewhere between 320 and 360 pounds. (Id. at 364). The ALJ and plaintiff discussed plaintiff's unemployment and public assistance benefits, willingness to work, and homeless status (id. at 364-68), before delving into plaintiff's education, training, and recent work history. (Id. at 368-75).

45

Plaintiff testified that since she last worked her conditions had become more acute. (Id. at 375). In particular, plaintiff stated that her anxiety had become more debilitating (id.); she noted that staffers at New Providence had to call EMS because her "anxiety was a bit out of control" and that she usually travels with an escort because when she uses public transportation her anxiety flares up. (Id. at 366-67). Plaintiff and the ALJ also discussed plaintiff's migraines, which she stated she has experienced "pretty much all [her] life" (id. at 376) and are severe enough to make her pass out (id. at 376, 391-92); muscle spasms and back problems, which she stated she has experienced "for a long time" (id. at 376, 382-83); claustrophobia (id. at 377); and depression (id. at 382). During this exchange, the ALJ said to plaintiff "it sounds like your biggest issues are connected with emotions or psychological issues," to which plaintiff responded in the affirmative. (Id. at 378).

Plaintiff and the ALJ briefly discussed plaintiff's treatment history (id. at 378-83, 387-88) before addressing her employment record. (Id. at 383-85). The ALJ then asked plaintiff to elaborate on why her condition had become so bad that she was no longer able to do her job as a teacher and teacher's

46

assistant. (Id. at 385). Plaintiff said that she is "always looking for something to do" and is "calmer" when she is busy and multi-tasking. (Id. at 386). Plaintiff further explained that the confluence of her unemployment, which left her with nothing to do, and residence in the shelter, where she faced several challenges, among them unhelpful shelter staffers (id. at 377, 386) and bad roommates (id. at 403), produced conditions that led to the substantial deterioration of her mental condition. (Id. at 386).

The ALJ concluded the hearing by explaining to plaintiff that he would seek additional information from her various doctors and therapists in order to have a complete picture of plaintiff's health and abilities and enable him to make an appropriate decision in her case. (Id. at 388-90, 394).

B. **February 10, 2009 Hearing**

Plaintiff next appeared before the ALJ on February 10, 2009. (Id. at 398). Plaintiff noted that at the time of the hearing she was still being seen at Post Graduate for treatment. (Id. at 399-400). Plaintiff and the ALJ discussed the Post Graduate psychiatrist's decision to take plaintiff off of her

47

medication "cold turkey" (id. at 400-01, 405-06), the shelter's refusal to provide residents with Metro cards as the reason for plaintiff's spotty attendance at BCP and Woodhull therapy sessions (id. at 401-03), and plaintiff's potential referral to a new mental health facility. (Id. at 407).

Throughout both hearings plaintiff and the ALJ discussed the variety of medications plaintiff was taking or had taken for her various ailments. (See id. at 375, 376, 378, 381, 403-05). These medications included Fluoxetine and Zoloft for treatment of depression (id. at 375, 381), Seroquel and Lamictal for Bipolar Disorder and mood stablization (id. at 375-76, 378), Naproxen for arthritis (id. at 344, 376), Compazine and Zomig for migraines (id. at 376), Clonazepam for anxiety (id.), Xanax for panic attacks (id. at 404), Doxepin for sleep troubles (id. at 337), Albuterol and Advair for asthma (id. at 101, 121), and Relafen and Flexoril for back pain. (Id. at 101, 376).

## VI. **Standard for Benefit Eligibility**

In order to qualify for disability insurance benefits, an applicant claiming disability must "demonstrate that she was disabled as of the date on which she was last insured." Behling

48

v. Comm'r of Soc. Sec., 369 F. App'x 292, 294 (2d Cir. 2010)
(citing 42 U.S.C. § 423(a)(1)(A)). To qualify for SSI benefits,
an applicant must meet the resource and income limits
established by the Act. Mesias v. Doe, 2012 WL 3704824, at *3
(E.D.N.Y. 2012); see 20 C.F.R. § 416.202. The SSA determines
applicants' eligibility for SSI benefits on a month-to-month
basis. See 20 C.F.R. § 416.203. For purposes of eligibility for
either disability or SSI benefits, an applicant is "disabled"
within the meaning of the Act if she is unable "'to engage in
any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected
to . . . last for a continuous period of not less than 12
months.'"[11] Carroll v. Sec'y of Health & Human Servs., 705 F.2d
638, 641-42 (2d Cir. 1983) (quoting 42 U.S.C. § 423(d)(1)(A)).


    The Act requires that the relevant physical or mental
impairment be "'of such severity that [plaintiff] is not only
unable to do h[er] previous work but cannot, considering h[er]
age, education, and work experience, engage in any other kind of

---

[11] "Substantial gainful activity" is defined as work that
"[i]nvolves doing significant and productive physical or mental
duties" and "[i]s done (or intended) for pay or profit." 20
C.F.R. § 404.1510; see, e.g., Craven v. Apfel, 58 F. Supp.2d
172, 183 (S.D.N.Y. 1999); Pickering v. Chater, 951 F. Supp. 418,
424 (S.D.N.Y. 1996).

substantial gainful work which exists in the national economy.'" Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) (quoting 42 U.S.C. § 423(d)(2)(A)). If the plaintiff can perform substantial gainful work existing in the national economy, it is immaterial, for purposes of the Act, that an opening for such work may not be found in the immediate area where she lives or that a specific job vacancy may not exist. 42 U.S.C. § 423(d)(2)(A). The same criteria apply to applications for SSI benefits. See, e.g., Reyes v. Barnhart, 2004 WL 439495, at *4 (S.D.N.Y. Mar. 9, 2004); Rodriguez v. Barnhart, 2002 WL 31307167, at *5 (S.D.N.Y. Oct. 15, 2002).

        In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnosis or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988). The SSA regulations set forth a five-step sequential process under which an ALJ must evaluate disability claims. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920. The Second Circuit has described this sequential process as follows:

> First, the Secretary considers whether the
> claimant is currently engaged in substantial
> gainful activity. If [s]he is not, the
> Secretary next considers whether the
> claimant has a "severe impairment" which
> significantly limits [her] physical or
> mental ability to do basic work activities.
> If the claimant suffers such an impairment,
> the third inquiry is whether, based solely
> on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of
> the regulations. If the claimant has such an
> impairment, the Secretary will consider
> h[er] disabled without considering
> vocational factors such as age, education,
> and work experience; the Secretary presumes
> that a claimant who is afflicted with a
> "listed" impairment is unable to perform
> substantial gainful activity. Assuming the
> claimant does not have a listed impairment,
> the fourth inquiry is whether, despite the
> claimant's severe impairment, [s]he has a
> residual functional capacity to perform
> h[er] past work. Finally, if the claimant is
> unable to perform h[er] past work, the
> Secretary then determines whether there is
> other work which the claimant could perform.

Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir. 1996) (emphasis in

original) (quoting Rivera v. Schweiker, 717 F.2d 719, 722-23 (2d

Cir. 1983)).


    To determine whether the claimant has one of the Appendix 1

"listed" impairments referred to in the third step of the

sequential process, the ALJ must consult the relevant criteria

for each listing. "The criteria in paragraph A substantiate

medically the presence of a particular mental disorder" while "[t]he criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, App. 1, § 12(A). The claimant has a listed disorder "if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied." Id.

If the claimant does not have a listed impairment, before proceeding to the fourth step of the sequential process the Commissioner must determine claimant's Residual Functional Capacity ("RFC"), which is her ability to do physical and mental work activities on a sustained basis, despite limitations from her impairments. See, e.g., Bush, 94 F.3d at 45. Put another way, RFC is a claimant's maximum remaining ability, despite her limitations, "'to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.'" Schultz v. Astrue, 2008 WL 728925, at *6 (N.D.N.Y. Mar. 18, 2008) (quoting Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999)). If a claimant has more than one impairment, all MDIs must be considered, including those that

52

are not "severe." The assessment must be based on all relevant medical and other evidence, such as physical abilities, mental abilities, and symptomology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a)(1)-(3).

Plaintiff bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step, that is, demonstrating the existence of jobs in the economy that plaintiff can perform. See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

## VII.   **The ALJ's Decision**

The ALJ issued his decision denying plaintiff's claim on February 25, 2009. (Tr. 15-20). He noted, as a threshold matter, that plaintiff had "acquired sufficient quarters of coverage to remain insured through September 30, 2009" (id. at 15), indicating that should he find that plaintiff was disabled, she would be qualified to receive benefits because she was insured on the onset date of the alleged disability.

53

At step one of the sequential analysis, the ALJ determined that plaintiff had not engaged in substantial gainful activity since August 27, 2007. (Id. at 17). At step two, the ALJ found that plaintiff had two severe impairments: depression, described as an affective disorder, and borderline personality traits, which is a personality disorder. (Id.). The ALJ cited documents from BCP in support of this determination. (Id.). The ALJ also noted at step two that plaintiff had "moderate difficulties in interacting appropriately with supervisors," and cited Dr. Monge's Medical Source Statement in support of this determination. (Id.).

At step three, the ALJ looked to the listings for Affective Disorders, 20 C.F.R. § 404, Subpart P, App. 1, § 12.04, and Personality Disorders, 20 C.F.R. § 404, Subpart P, App. 1, § 12.08, and noted that in order to satisfy the paragraph B criteria, plaintiff's impairment must satisfy two of the following four conditions: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpart P, App. 1, §§ 12.04, 12.08.

The ALJ determined that plaintiff had no restriction in activities of daily living. In doing so he cited plaintiff's testimony, treating reports from Woodhull and BCP, and hospital records from Bellevue reflected intermittent symptoms. (Tr. 17).

The ALJ determined that plaintiff had only slight difficulties in social functioning. In support of this determination, the ALJ cited Dr. Monge's concern that plaintiff would have moderate difficulty in responding to supervision and Dr. Eyassu's determination that plaintiff might need supervision with complex tasks. (Id. at 17-18). The ALJ also determined that plaintiff had mild difficulties with respect to concentration, persistence, or pace, expressly deferring to Dr. Monge's findings in his conclusion. (Id. at 18).

Finally, the ALJ determined that plaintiff had no episodes of decompensation. The ALJ concluded that plaintiff's reports of anxiety attacks were impossible for her doctors to confirm due to her frequent absences and non-compliance with treatment. (Id.).

Because the ALJ found that plaintiff's impairments did not satisfy any of the four paragraph B conditions (id. at 17-18),

he turned to paragraph C. He found that the evidence failed to
establish the presence of paragraph C criteria, saying that the
"psychiatric opinion expressed" was "unanimous" that plaintiff
"had no significant mental limitations except possible moderate
(i.e. intermittent) limitations in dealing with detailed
instructions and with supervision." (Id. at 18).

    Since the ALJ found that plaintiff's impairments satisfied
neither the paragraph B nor the paragraph C requirements, he
determined that plaintiff did not have an impairment or
combination of impairments that met the Appendix 1 criteria.
(Id. at 17).

    Before proceeding to step four of the sequential process,
the ALJ assessed plaintiff's RFC. (Id. at 18-19). The ALJ
concluded that plaintiff had the RFC "to perform a full range of
work at all exertional levels" with the nonexertional limitation
that she "would on occasion require some patience, e.g. extra
time, in carrying out detailed instructions." (Id. at 18). The
ALJ stated that plaintiff's symptoms could reasonably have been
caused by her medically determinable impairments, but that
plaintiff's "statements regarding the intensity, persistence,
and limiting effects of these symptoms could not be fully

credited because they were inconsistent with" the medical experts' RFC assessments and evaluations of her mental condition. (<u>Id.</u> at 19).

Specifically, in terms of physical impairments, the ALJ noted that plaintiff's back problems and asthma did not exist for long enough to meet the duration requirement and were insufficient, by themselves, to bar plaintiff from returning to work more than temporarily. (<u>Id.</u>). As for mental impairments, the ALJ stated that "[t]he opinion evidence was unanimous and compelled a conclusion that [plaintiff] was not precluded from working for mental reasons" (<u>id.</u>), but he did not provide any citations to the medical record to back up this conclusion.

At step four, the ALJ determined that plaintiff was capable of performing her past work as a teacher's assistant and after-school program teacher. (<u>Id.</u>). The ALJ noted that he compared plaintiff's RFC with the physical and mental demands of her work, and found that plaintiff was able to effectively perform her duties. (<u>Id.</u>).

Since the ALJ deemed plaintiff able to perform her past work, he never applied the step-five analysis. Rather, he found

that plaintiff was not disabled, as defined by the Act, and therefore was not entitled to benefits. (Id. at 20).

VIII.  **Analysis**

A.  **Standard of Review**

When a claimant challenges the SSA's denial of disability insurance benefits, the court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)); see also 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). The substantial-evidence test applies not only to the

Commissioner's factual findings, but also to inferences to be drawn from the facts. See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp.2d 208, 214 (S.D.N.Y. 1999). In determining whether the record contains substantial evidence to support a denial of benefits, the reviewing court must consider the whole record, weighing the evidence on both sides of the question. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Williams, 859 F.2d at 258.

It is the duty of the Commissioner, not the courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Nonetheless, while the ALJ need not resolve every conflict in the record, Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

In addition to considering the sufficiency of the evidence in the record, a reviewing court must consider the ALJ's

application of the law to the record before him. Even if the record, as it stands, contains substantial evidence of disability, the SSA decision may not withstand challenge if the ALJ committed legal error. Balsamo, 142 F.3d at 79.

Of particular importance, as disability benefits proceedings are non-adversarial in nature, the ALJ has an affirmative obligation to fully develop the administrative record, even when a claimant is represented by counsel. Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (citing Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (internal quotation marks omitted)); see also Butts, 388 F.3d at 386. To this end, the ALJ must make every reasonable effort to help an applicant procure medical reports from her medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d).

More specifically, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine claimant's residual functional capacity." Casino Ortiz v. Astrue, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing 20 C.F.R. § 404.1513(e)(1)-(3)). The ALJ must therefore seek additional evidence or clarification when the "report from claimant's medical source contains a conflict or ambiguity that

must be resolved, the report does not contain all the necessary information, or [it] does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." Bonet v. Astrue, 2008 WL 4058705, at *18 (S.D.N.Y. Aug. 22, 2008) (brackets omitted).

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so he must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Pacheco v. Barnhart, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) ("It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions."). Courts in this Circuit have long held that an ALJ's "failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996).

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings. See 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). If there are gaps in the administrative record or the ALJ has applied an improper legal standard, the court will remand the case for further development of the evidence or for supplemental findings. Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386.

B. **Evaluation**

At the outset of our evaluation, we note that plaintiff's response to defendant's motion for judgment on the pleadings, which we view as a pro se cross-motion for judgment on the pleadings, focuses solely on plaintiff's mental ailments in her prayer for relief. (See Pl. Mem. 2). Additionally, plaintiff noted at her initial hearing before the ALJ that her "biggest" issues were connected with emotional, mental, and psychological

ailments. (Tr. 378). Therefore, our evaluation focuses on plaintiff's mental condition.

For the reasons set forth below, we conclude that the ALJ failed to sufficiently develop the administrative record, did not adequately consider the record he had before him, fell short in properly explaining the reasoning behind his decisions, and failed to undertake a proper credibility analysis of plaintiff. These flaws in the ALJ's decision all justify remanding the case to the SSA for further consideration.

### 1. **The ALJ Has the Affirmative Obligation to Ensure that the Administrative Record is Complete**

When reviewing a decision denying benefits to a plaintiff, "we must first satisfy ourselves that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'" Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 43 (2d Cir. 1972)). The SSA regulations mandate that it is the ALJ's responsibility to develop plaintiff's "complete medical history for at least the 12 months preceding the month

63

in which" plaintiff filed an application for benefits. 20 C.F.R.
§ 404.1512(d). Additionally, the SSA regulations require the ALJ
to delve into the "complete medical history for the 12-month
period prior to the month" plaintiff was last insured for
benefits. 20 C.F.R. § 404.1512(d)(2); see also Pino v. Astrue,
2010 WL 5904110, at *18 (S.D.N.Y. Feb. 8, 2010).

### a. Lack of Medical Reports from New Providence

While the administrative record compiled by the ALJ spanned
in excess of 400 pages, the record contained no files, reports,
or treatment notes of any kind from Dr. Kaplan or any other
medical source at New Providence.

Failure to obtain these documents was plain error.
Plaintiff filed her application for benefits and a period of
disability on February 6, 2008 (Tr. 15); she resided at New
Providence for almost one year, from September 8, 2007, through
September 5, 2008 (id. at 406-07); and she was insured through
September 30, 2009. (Id. at 15).

Plaintiff lived at New Providence for a substantial portion
of the twelve-month period prior to the month in which she

64

applied for benefits. Therefore, the SSA regulations mandated
that the ALJ obtain reports of any medical care plaintiff
received at New Providence and any medical diagnoses made while
plaintiff was living at New Providence in order to satisfy his
burden of developing plaintiff's complete medical history. See
Tejada, 167 F.3d at 774; Tempesta v. Astrue, 2009 WL 211362, at
*4 (E.D.N.Y. Jan. 28, 2009).


Medical information from treating sources at plaintiff's
home is plainly relevant to plaintiff's medical condition. As
plaintiff reported seeing Dr. Kaplan twice a month while at New
Providence (id. at 388), Dr. Kaplan's medical opinions would be
germane to the ALJ's deliberations. Indeed, the ALJ admitted as
much when he stated during the administrative hearing that he
would contact Dr. Kaplan and ask her for plaintiff's treatment
notes. (Id.).


Additionally, plaintiff was last insured on September 30,
2009 (id. at 15), meaning that the ALJ was required to look into
obtaining records beginning from September 2008. Plaintiff lived
at New Providence until September 5, 2008, when she left New
Providence for Susan's Place in the Bronx. (Id. at 406-07).
Therefore, plaintiff's residency at New Providence overlapped,

65

by five days, with the twelve-month period prior to the month in which plaintiff was last insured. Because of this five-day convergence, the ALJ was required to obtain medical records from New Providence. See Pino, 2010 WL 5904110, at *19.

The absence of this medical documentation was error; on remand, the ALJ should seek out and obtain any records from New Providence that may shed further light on plaintiff's condition.

      b. **Failure to Augment the Record with Additional Documents from Susan's Place and Post Graduate**

While the administrative record does contain some documentation from Susan's Place and Post Graduate, the nature of the treatment plaintiff received from these facilities and the time frame in which plaintiff was treated point to the need for additional documentation.

      i. **Susan's Place – Lack of Documentary Coverage for Full Period of Residency**

Plaintiff resided at Susan's Place from September 5, 2008 through at least February 10, 2009, the date of plaintiff's

second hearing before the ALJ. (Id. at 406-07).[12] Despite plaintiff's extended stay, during which time she was supervised and treated by medical professionals, the only documentation in the record from Susan's Place is Dr. Bampoe's Psychiatric Evaluation. (Id. at 24-30). The Evaluation is thorough, but only covers plaintiff's condition from September 2008 to November 2008. Since plaintiff's residency at Susan's Place fell firmly within the twelve-month period prior to September 2009, the month during which plaintiff was last insured, the ALJ, as well as the Appeals Council[13], had the obligation to obtain additional records from Susan's Place in order to fill out the complete medical record for the time period. Their combined failure to do so requires remand.

Specifically, on remand the ALJ should first obtain any relevant medical records for the period from December 2008 to

---

[12] The record provides no definitive evidence to suggest exactly when plaintiff moved out of Susan's Place, save for three different Bronx, NY addresses that were used as mailing locations for Lewis' communications with the SSA in 2009 and 2011. (Id. at 3, 7, 8, 11).

[13] Both the ALJ and the Appeals Council have the affirmative obligation to develop the administrative record. Anderson v. Astrue, 2009 WL 2824584, at *15 (E.D.N.Y. Aug. 28, 2009) (citing Boyd v. Apfel, 1999 WL 1129055, at *5 (E.D.N.Y. Oct. 15, 1999)); see also 20 C.F.R. §§ 404.976(b)(2), 416.147(b)(3); Richardson v. Apfel, 44 F. Supp. 556, 563 (S.D.N.Y. 1999).

February 2009. Second, the ALJ should determine how long plaintiff continued to reside at Susan's Place after the date of the second hearing. Third, the ALJ should attempt to obtain any relevant records from Susan's Place for this post-hearing period of residency, through plaintiff's last date of insurance coverage.

### ii. Post Graduate – Absence of Reports from New Treating Physician

Plaintiff stated that she received treatment at Post Graduate beginning in the fourth quarter of 2008. (Id. at 399-400). Plaintiff's treatment at the social rehabilitation clinic continued into 2009; the administrative record contains several prescriptions written by Dr. Holmgren dated February 2, 2009. (Id. at 21-23). These prescriptions are the only documents in the medical record from Post Graduate. The lack of additional documentation necessitates remand.

From the evidence available in the record, it appears that at a certain point Post Graduate became plaintiff's principal place of medical treatment. In late October 2008, plaintiff began going to Post Graduate for treatment. (Id. at 399-400).

Around this very time documents in the record indicate that plaintiff ceased seeing Dr. Monge and Mendzies at Woodhull; Dr. Monge's last observations and findings in the record were from documents dated September 12, 2008 (id. at 219, 226-28, 329-30), while Mendzies' reports stop after October 20, 2008. (Id. at 197, 220).

This documentary evidence is corroborated by plaintiff's testimony at her second hearing. When the ALJ asked plaintiff about some new documents that he had received, she noted that her "new doctor," referring to Dr. Holmgren, had given her prescriptions because she was not permitted to "have therapy in two places" at one time. (Id. at 400). The available evidence points to a switch in plaintiff's medical care from Woodhull and Dr. Monge to Post Graduate and Dr. Holmgren. Since plaintiff's treatment effectively transferred from Dr. Monge to Dr. Holmgren, it follows that Dr. Holmgren took on Dr. Monge's former status as plaintiff's primary treating doctor.

The SSA regulations provide that "opinions from [a claimant's] treating sources" are "give[n] more weight" than other sources, and are even given "controlling weight" when the treating source's opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques" and
"not inconsistent with the other substantial evidence" in the
record. 20 C.F.R. § 404.1527(c)(2). This regulation ensures that
the findings of those medical sources "most able to provide a
detailed, longitudinal picture of [a claimant's] medical
impairment(s)" are taken into account and given deference by the
ALJ. Id.

This "treating-physician rule" presupposes that the
administrative record contains evidence of the treating
physician's findings for the ALJ to consider in his
deliberations. Where such evidence from the doctor who likely
knew plaintiff's condition best is absent, as it is here, it
leaves a gap in the evidentiary record that hinders the ALJ's
ability to determine plaintiff's RFC. This requires the ALJ to
re-open and re-examine the record. Indeed, courts within this
Circuit have held that "the lack of treating physician evidence
alone [is] sufficient for remand." Williams v. Sullivan, 1992 WL
135236, at *4 (E.D.N.Y. May 29, 1992) (citing Smith v. Sullivan,
776 F.Supp 107, 112-14 (E.D.N.Y. 1991)).

The absence of any evaluation of plaintiff's condition from
Dr. Holmgren is puzzling considering that the ALJ knew that at

70

least one such evaluation existed. During the second hearing, plaintiff stated that she did not "have a copy of Dr. [Holmgren's] evaluation. He refused to give me a copy. He says my . . . case manager has to request that." (Tr. 405).

Considering the primacy of Dr. Holmgren's findings as plaintiff's treating physician and the fact that plaintiff's treatment at Post Graduate fell within the twelve-month period of time prior to the month in which plaintiff was last insured, the absence of medical records from Dr. Holmgren is plain error and necessitates remand. On remand, the ALJ should seek out Dr. Holmgren's evaluation identified by plaintiff and any other evaluations, records, and conclusions stemming from plaintiff's treatment at Post Graduate.

### iii. **The Importance of the Missing Records**

Records providing the findings and diagnoses of shelter-based medical professionals, from both Susan's Place and New Providence, are especially important for the ALJ to obtain given that plaintiff's prayer for relief relies exclusively on her mental and psychological symptoms, which she contends were caused in large part by stress from living in the shelters. (Id.

at 188, 190; see Pl. Mem. 2). Similarly, records from New Providence, Susan's Place, and Post Graduate would all shed light on plaintiff's condition, and the impact of living in the shelters on her condition, after the alleged onset date of her disability, and would help the ALJ determine whether plaintiff lost the ability to do work not on August 27, 2007, but at some later date. (See Tr. 390).

There is no evidence in the record to indicate whether the ALJ made any effort to obtain documents from Susan's Place and Post Graduate. We acknowledge that the ALJ may have run into difficulties in his attempts to obtain these documents. Considering that plaintiff only first received care from these institutions after her initial appearance before the ALJ, that certain documents may have been created mere days before the second hearing, and that the administrative and bureaucratic process for requesting documents and processing these requests may be time- and labor-intensive, we understand why the ALJ may not have been able to include these documents in his decision-making process even if he had requested them before considering, writing, and publishing his decision.

Yet the ALJ need not have issued his decision when he did. The fact that the decision was issued on February 25, 2009, just two weeks after conducting the second hearing (id. at 15), indicates that the ALJ may have been driven by a desire to arrive at a speedy disposition. However laudable considerations of speedy judicial decision-making may be, see Gordon v. Heckler, 586 F. Supp. 805, 807 (E.D.N.Y. 1984) ("there is an important interest in having plaintiff's request resolved promptly"), these interests must be considered alongside, and not to the exclusion of, the regulations and evaluative processes promulgated for ALJs to follow in these cases. See 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920; see also DeReinzis v. Heckler, 748 F.2d 352 (2d Cir. 1984). With such important evidence lacking here, the ALJ was required to request more documents and wait to issue his decision until he received these documents and took them into account, or in the alternative was informed that no such documents existed.

2. **The ALJ Must Consider the Record in its Entirety and Acknowledge all Relevant Evidence**

In addition to the incompleteness of the record, the ALJ did not take into account the entirety of the record that was in

73

front of him in his analysis and decision. SSA regulations provide that the ALJ's assessment of plaintiff's RFC "must be based on all relevant . . . evidence," medical or otherwise. 20 C.F.R. § 404.1545(a)(3). The ALJ failed in this regard in several respects.


a. **The ALJ's Analysis Completely Fails to Acknowledge Reports in the Record**


The ALJ simply omitted from consideration, and failed to acknowledge or reference in his deliberations, any input from Mendzies and the WeCARE team that may have added to, or been in tension with, his analysis, despite having a full complement of documents and evaluations from these medical professionals.


i. **Failure to Take Mendzies' Treatment Notes Into Account**


Mendzies, a clinical social worker, saw plaintiff somewhat regularly in therapy sessions for the length of plaintiff's treatment at Woodhull, which spanned from February 2008 to September 2008. Over the course of these eight months Mendzies and plaintiff met nine times, most consistently in the early

spring when the two met for therapy sessions roughly every other week. The record contains Mendzies' detailed treatment notes, observations, and diagnoses related to plaintiff's mental condition over this extended period of time.

Mendzies' insights, memorialized in the record, are highly relevant to plaintiff's RFC. Plaintiff argues that she is entitled to benefits on the basis of her mental condition, specifically her inability to deal with stress (see Pl. Mem. 2), and Mendzies' evaluations speak directly to plaintiff's psychological state throughout the time period in which plaintiff claims to have been disabled. Mendzies frequently noted plaintiff's anger, frustration, terror, and depression (Tr. 210, 213, 214). She also frequently talked with plaintiff about the adverse emotions plaintiff was experiencing while living in the shelter system (id. at 190, 212, 213), and plaintiff's efforts to find alternative housing. (Id. at 214, 216, 218).

Since the ALJ relied so heavily on Dr. Monge's findings in his decision, it is apparent that the ALJ thought plaintiff's treatment at Woodhull was relevant. However, nowhere in the ALJ's discussion of plaintiff's RFC, nor anywhere in his

75

decision, is there any reference to or mention of Mendzies' insights.[14] Even though Mendzies is not a doctor and did not provide diagnoses of MDIs, the SSA regulations require that her insights as plaintiff's long-term therapist be taken into account as relevant "other" evidence. 20 C.F.R. § 404.1545(a)(3).

Because the ALJ failed to use Mendzies' findings as part of the basis of his decision, he committed legal error. On remand, the ALJ should use Mendzies' insights to help determine plaintiff's RFC and to resolve whether plaintiff lost the ability to perform work at any time during the relevant period.

ii. **Failure to Consider WeCARE's Biopsychosocial Summary**

The ALJ's failure to mention the Biopsychosocial Summary report prepared by the intake and medical professionals at the HRA's WeCARE program constitutes error.

---

[14] Mendzies' reports are found in Document Number 11F ("11F") in the administrative record, intermingled with some of Dr. Monge's treatment notes. While the ALJ does reference 11F twice in his decision, in neither instance does he cite Mendzies' findings or conclusions.

First, Salkey, an Intake Specialist, noted that plaintiff suffered from a veritable laundry list of mental ailments, including anxiety, PTSD, Bipolar Disorder, OCD, claustrophobia, and depression. (Tr. 337). Salkey even noted that plaintiff's depression was "moderate" in severity. (Id.). Even though Salkey is not a medical doctor, plaintiff was entitled to have the ALJ consider these findings in his analysis. 20 C.F.R. § 404.1545(a)(3).

Second, the ALJ never referenced a second portion of Salkey's intake report. In this section of the report, plaintiff was posed several questions regarding how frequently she experienced a variety of negative mental and emotional phenomena, and in nearly every case reported experiencing these phenomena with a good deal of frequency. See supra at pp. 31-32. The ALJ never even acknowledged the existence of such evidence in his decision. Surely plaintiff's reports of "feeling down, depressed, or hopeless" or having "little interest or pleasure in doing things," even unsubstantiated by MDIs, have a role to play in determining plaintiff's RFC as "other" evidence to consider. 20 C.F.R. § 404.1545(a)(3); see Deronde v. Astrue, 2013 WL 869489, at *4 (N.D.N.Y. Feb. 13, 2013) ("[Reports] from

claimants, therefore, [are] not only relevant, but desirable"
for ALJs to take into account).

Third, by failing to include the WeCARE team's findings in
his analysis, the ALJ omitted Dr. Rahim's evaluation of
plaintiff's condition. In addition to diagnosing plaintiff with
a series of mental ailments (Tr. 349), the doctor assessed
plaintiff's employability. Dr. Rahim concluded that he could not
conclusively evaluate plaintiff's RFC due to mental health
conditions, and that at the time of the evaluation plaintiff was
not stable enough to work. (Id.). See supra at pp. 33-34.

Dr. Rahim's evaluation calls into question some of the
findings the ALJ made in his decision. When discussing the
paragraph C criteria, the ALJ stated that the "psychiatric
opinion expressed" was "unanimous" that plaintiff did not have
significant mental limitations, save potential issues with
following detailed instructions and respecting supervision. (Id.
at 18). Subsequently, when specifically discussing plaintiff's
RFC at the step-four analysis, the ALJ stated that the evidence
was unanimous that plaintiff was not precluded from working for
mental reasons. (Id. at 18).

78

In light of Dr. Rahim's evaluation, the ALJ's statements regarding the unanimity of the evidence cannot possibly be correct. Had the ALJ considered Dr. Rahim's medical evaluation, as he should have, it is quite possible that, with the nature of the evidence before him changed, the ALJ would have reached a different conclusion regarding the presence of paragraph C criteria, the step-three question of whether she suffered from a listed impairment, and plaintiff's RFC to perform her past work. These are issues to be addressed and decided upon remand.

The ALJ's failure to acknowledge the reports from Mendzies and the WeCARE professionals in his decision constitutes error. On remand, the ALJ should reassess and redetermine the RFC, the presence of paragraph C criteria, and whether plaintiff suffered from a listed impairment by considering all of the sources in the record and by giving each source's findings appropriate weight.

b. **The ALJ Did Not Properly Consider All of Dr. Monge's Findings**

The ALJ properly devoted a great deal of his analysis to evaluating Dr. Monge's findings. As plaintiff's treating

physician, Dr. Monge was the doctor who knew plaintiff and her condition best, and his medical conclusions were entitled to deference from the ALJ. See 20 C.F.R. § 404.1527(c)(2). However, the ALJ's consideration of Dr. Monge's findings was flawed in that he failed to account for several documents in the record containing Dr. Monge's comments, thereby eliding some of the doctor's findings and diagnoses that could have added to the analysis and potentially undercut the ALJ's conclusions.

Plaintiff visited Dr. Monge for checkups and medical examinations after she was accepted into Woodhull's treatment and therapy program on the last day of March 2008. (Tr. 205). Over a time period spanning from April 2008 to September 2008, Dr. Monge examined plaintiff six times, and on another occasion filled out a document reviewing plaintiff's treatment. (Id. at 191, 199, 210, 212, 215, 217, 219, 226-28, 316, 319, 320, 331-33). After these visits Dr. Monge catalogued plaintiff's myriad mental and physical afflictions, her present abilities and moods, and her five-axis diagnoses in his notes. See supra at pp. 20-26. Along with the Wellness Plan Report and Medical Source Statement, these treatment notes provide the sum total of the evidence available to the ALJ in the record from Dr. Monge.

Despite the presence of all these documents, at every stage of the analysis in his decision, whenever the ALJ cited Dr. Monge's findings to substantiate his conclusions, he relied nearly exclusively on the Medical Source Statement. Only once, in assessing one of the paragraph B criteria, does the ALJ even reference Dr. Monge's treating notes. (Tr. 17). Moreover, there is no mention whatsoever of the Wellness Plan Report, which was prepared concomitantly with the Medical Source Statement.

For the ALJ to rely so heavily on the Medical Source Statement is only natural; it is an official document whose questions speak directly to the SSA five-step sequential process for determining disability status and require doctors to come to a series of conclusions. But the existence of these conclusions does not permit the ALJ to cherry-pick which documents and evidence he looks at, ignoring some and using others. The Medical Source Statement is but one document in a series to take into account. The medical facts and findings in the other documents point to a variety of plaintiff's mental health issues, including PTSD (Tr. 205, 329); a GAF score that indicates "serious" symptoms, impairments, and/or difficulties in social and occupational functioning (id.); claustrophobia (id.); Bipolar Disorder (id. at 320, 329); and anxiety and

81

depression. (Id. at 316). Dr. Monge's reports also noted
plaintiff's struggles with living in the shelter environment.
(Id. at 212, 217, 329-30). These medical facts and commentary,
if considered alongside Dr. Monge's Medical Source Statement,
could potentially have pointed the ALJ toward a different
conclusion in his decision. Plaintiff was entitled to have these
findings considered by the ALJ in his analysis. See Hartzog v.
Astrue, 2012 WL 4461749, at *6 (W.D.N.Y. Sept. 25, 2012); see
also Winkler v. Metro. Life Ins. Co., 170 F. App'x. 167, 168 (2d
Cir. 2006) (in ERISA long-term disability plan context,
administrators may not cherry-pick preferred evidence "while
ignoring significant evidence to the contrary").

Since the treatment notes and Wellness Plan Report contain
"objective medical facts" from plaintiff's appointments with Dr.
Monge, and the Medical Source Statement's conclusions represent
"diagnoses or medical opinions based on [these] facts," the
ALJ's failure to substantially consider these other documents is
legal error. See Williams, 859 F.2d at 259. The ALJ improperly
considered the conclusions in the Medical Source Statement at
the expense of the supposed factual predicates for these
conclusions. See Pratts, 94 F.3d at 38. (Where "bases for . . .
conclusions were lost," and therefore unusable by the ALJ,

remand is appropriate because the "ALJ's decision [was un]supported by substantial evidence"). Moreover, if there existed potential tension between the Medical Source Statement and the treatment notes, the ALJ should have contacted plaintiff's treating doctor for clarification, as per the regulations. See Rosa, 168 F.3d at 79. Since the ALJ "fail[ed] to acknowledge relevant evidence" and "explain its implicit rejection," Pagan, 923 F. Supp. at 556, the ALJ committed legal error. On remand, the ALJ should take all of Dr. Monge's records into account when analyzing plaintiff's claim for benefits.

### 3. **The ALJ Must Provide a Detailed Explanation of the Factors Underlying his Decision**

On top of the ALJ's failure to develop the record and consider all of the evidence in front of him, he did not sufficiently explain the basis for his conclusions. Too often throughout the decision the ALJ spoke in broad, vague generalities and failed to provide specific details supporting his conclusions. At step three, during the RFC analysis, and at step four, the ALJ did not adequately discuss plaintiff's mental impairments and their implications for her disability status.

a.  **Step Three**

i.  **Paragraph B Criteria**

The ALJ's discussion at step three regarding whether plaintiff satisfied the paragraph B criteria was lacking in one important respect: the ALJ did not properly address plaintiff's difficulties in maintaining concentration, persistence, or pace. In lieu of an explanation for why he determined that plaintiff had only mild difficulties, the ALJ cited Dr. Monge's Medical Source Statement and stated that Dr. Monge's findings required this conclusion. (Tr. 18). While deference to Dr. Monge's findings is generally warranted, see 20 C.F.R. § 404.1527(c)(2), the treating-physician rule does not allow the ALJ to forgo a detailed explanation of his findings. See Urena-Perez v. Astrue, 2009 WL 1726212, at *6 (S.D.N.Y. June 18, 2009) (ALJ violated the treating-physician rule by failing to offer a rationale for accepting treating physician's findings because this determination "plainly" required "further explanation"). Once again, the ALJ did not explain the logical connection between the evidence he cited and his conclusions. We have no indication how Dr. Monge's findings in the Medical Source Statement, which never mention "concentration, persistence, or pace," relate to

84

the ALJ's findings. This was legal error that should be remedied on remand.

ii.  **Paragraph C Criteria**

The ALJ's analysis at step three regarding whether plaintiff satisfied the paragraph C criteria also fell short. In his decision, the ALJ noted that, with two possible exceptions, the evidence was unanimous that plaintiff had no significant mental limitations. (Tr. 18). See supra at 55. This analysis did not do enough to substantiate the ALJ's reasoning.

In Ferraris v. Heckler, the Second Circuit held that the ALJ's "vague reference to a 'consensus'" with respect to medical findings regarding "the key to the ultimate determination of [plaintiff's] disability" inadequately explained his decision-making process. 728 F.2d at 586. Here, plaintiff's mental condition is the crux of her case for disability. The ALJ described the medical findings with respect to plaintiff's mental limitations as "unanimous" (Tr. 18). This description was unaccompanied by any further explanation or citations to medical evidence in the record, and therefore was too vague and did not "set forth" the "crucial factors" in the ALJ's determination.

85

Id. at 587. On remand, the ALJ should explain why the medical professionals' findings indicate that plaintiff's limitations fell short of the threshold of a significant mental limitation.

### b.  **RFC Analysis**

The ALJ failed to explain the rationale underpinning his determination of the mental component of plaintiff's RFC. As he did in his step-three analysis, the ALJ described the opinion evidence with respect to plaintiff's mental limitations as "unanimous" (Tr. 19). This description was, again, unaccompanied by any further explanation or citations to medical evidence in the record. This explanation was not specific enough to enable us to review whether the determination was substantially supported, and necessitates remanding the case. See Ferraris, 728 F.2d at 587.

We reiterate that, contrary to the ALJ's statement, the evidence regarding plaintiff's mental limitations was not "unanimous," as Dr. Rahim's evaluation of plaintiff's mental state conflicted with other reports cited by the ALJ. See supra at pp. 33-34, 78-79. At best, the ALJ's conclusion of unanimity is not self-evident in light of a plethora of contrary evidence,

86

including plaintiff's prescription history, evaluations that put plaintiff's GAF score at 50, and multiple diagnoses of severe mental illness. On remand, the ALJ should use the same evidence that we directed he consider in determining plaintiff's RFC and the presence of paragraph C criteria to better explain the rationale behind his decision at both stages of the analysis.

c. **Step Four**

The ALJ's decision failed to offer a detailed explanation at step four for why plaintiff's RFC did not preclude her from performing her past relevant work at Harlem Children's Zone and Groundwork for the Youth. In support of his determination that plaintiff could perform her former duties, the ALJ only restated some of plaintiff's limitations. (Tr. 19-20). Importantly, the ALJ did not engage in any discussion with respect to the actual details of plaintiff's responsibilities as a teacher's assistant and after-school program teacher, and did not address how plaintiff's psychiatric limitations would impact her performance in these roles.

The ALJ's failure to grapple with plaintiff's RFC in the context of the specifics of her past positions was error. RFC

assessments, in order to be effective, "must include a discussion" of plaintiff's abilities on the basis of plaintiff's "sustained work activities" in her "ordinary work setting." Schultz, 2008 WL 728925, at *6. The ALJ's decision contained no reckoning of the variety of roles plaintiff played in her past work as an educator. The ALJ was required to weigh plaintiff's limitations against her past work, and his failure to do so constitutes error. See, e.g., Diaz, 59 F.3d at 315. On remand, the ALJ should detail the tasks plaintiff undertook in her immediate past employment and determine whether her ailments impaired her ability to accomplish these tasks.

Additionally, the ALJ's opinion did not address plaintiff's difficulties with public transportation. Plaintiff noted at her first hearing before the ALJ that she travels with an escort when using public transportation in order to minimize her anxiety. (Tr. 366-67). Additionally, Drs. Haley and Kamin both noted in their reports that plaintiff had difficulty taking public transportation. (Id. at 147, 164). Despite medical diagnoses of claustrophobia (id. at 329, 337) and anxiety (id. at 177, 178, 337, 346, 347, 349), plaintiff's testimony and impartial SSA consultant reports regarding the issue, the ALJ did not take into account plaintiff's inability to use public

transportation on her own. This was error. If plaintiff is unable to travel to her place of employment, this presents a significant limitation on her ability to perform work. See, e.g., Daniels v. Barnhart, 2002 WL 1905957, at *9 (S.D.N.Y. Aug. 16, 2002) ("Courts in this district have generally agreed that the inability to use public transportation provides a basis for concluding that a claimant cannot perform her past work.") (citing Rivera v. Sullivan, 771 F. Supp. 1339, 1356 (S.D.N.Y. 1991); Flanders v. Chater, 1995 WL 608287, at *7 (S.D.N.Y. Oct. 17, 1995)). On remand, the ALJ should incorporate plaintiff's difficulties with public transportation into his deliberations with respect to whether she was able to engage in her past work.

Finally, "'[t]he combined effect of a claimant's impairments must be considered in determining disability; the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe.'" Burgin v. Astrue, 348 F. App'x 646, 647 (2d Cir. 2009) (alteration in original) (quoting Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995)); see also 20 C.F.R. § 404.1523. The ALJ did not analyze whether plaintiff's many physical and mental impairments, when combined, could have rendered her unable to perform her past work. Further, the ALJ

89

failed to seek out or consider any doctors' input on the side effects of plaintiff's myriad medications and what their potential impact might be on her RFC.[15] This was error; on remand, the ALJ should analyze the effects of plaintiff's ailments in conjunction with each other to determine whether plaintiff could perform her past work.

### 4. The ALJ Failed to Undertake a Proper Analysis of Plaintiff's Credibility

#### a. Credibility Determinations

The ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of her pain and other subjectively-perceived conditions and her resulting limitations. See, e.g., Schultz, 2008 WL 728925, at *12 (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999)). If the ALJ's findings are supported by substantial evidence, a reviewing court must uphold the ALJ's decision to discount plaintiff's testimony. See Marcus, 615 F.2d at 27 (citing Richardson, 402 U.S. at 401).

---

[15] It should be noted that plaintiff herself reported side effects from her medication at different points in the administrative record. (See, e.g., Tr. 245, 252, 400).

Nonetheless, the ALJ's discretion is not unbounded. The Second Circuit has held that throughout the five-step process, "'the subjective element of [plaintiff's] pain is an important factor to be considered in determining disability.'" Perez v. Barnhart, 234 F. Supp.2d 336, 340 (S.D.N.Y. 2002) (quoting Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984)). This requirement is fully consistent with the SSA regulations. See 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("We will . . . consider descriptions and observations of [a claimant's] limitations from [his or her] impairment(s), including limitations that result from [his or her] symptoms, such as pain, provided by [the claimant]").

In assessing the claimant's testimony, the ALJ must take all pertinent evidence into consideration. E.g., Perez, 234 F. Supp.2d at 340-41; see also Snell, 177 F.3d at 135 (stating that an ALJ is in a better position to decide credibility than the Commissioner). Even if a claimant's account of subjective symptoms, including pain, is unaccompanied by positive clinical findings or other objective medical evidence,[16] it may still

---

[16] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(c)(2); see also Casino-Ortiz, 2007 WL 2745704, at *11 n.21 (quoting 20 C.F.R. §

serve as the basis for establishing disability as long as the impairment has a medically-ascertainable source. See, e.g., Harris v. R.R. Ret. Bd., 948 F.2d 123, 127 (2d Cir. 1991).

SSA regulations outline a two-step framework under which an ALJ must evaluate a claimant's subjective description of her impairment and related symptoms. 20 C.F.R. §§ 404.1529, 416.929. "First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the . . . symptoms alleged by the claimant." Martinez v. Astrue, 2009 WL 2168732, at *16 (S.D.N.Y. July 16, 2009) (alteration in original) (citing McCarthy v. Astrue, 2007 WL 4444976, at *8 (S.D.N.Y. Dec. 18, 2007)); see also 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). "Second, the ALJ must 'evaluate the intensity and persistence of those symptoms considering all of the available evidence.'" Peck v. Astrue, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010) (citing 20 C.F.R. § 404.1529(c)); accord Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii));

404.1529(c)(2)). Laboratory findings "are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 404.1528(c).

92

Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003)). "To the extent that the claimant's 'pain contentions are not substantiated by the objective medical evidence,' the ALJ must evaluate the claimant's credibility." Peck, 2010 WL 3125950, at *4 (citing 20 C.F.R. § 404.1529(c)); see also Meadors, 370 F. App'x at 183-84 (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii); Taylor, 83 F. App'x at 350-51).

It should be noted that "the second stage of [the] analysis may itself involve two parts." Sanchez v. Astrue, 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)." Id. (emphasis in original).

"Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)]." Sanchez, 2010 WL 101501, at *14 (citing Gittens v. Astrue, 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)). These factors include: (1) the individual's daily activities;

93

(2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); see also Bush, 94 F.3d at 46 n.4; Wright v. Astrue, 2008 WL 620733, at *3 (E.D.N.Y. Mar. 5, 2008) (citing SSR 96-7p). If the ALJ does not follow these steps, remand is appropriate. See Sanchez, 2010 WL 101501, at *15 (citing 20 C.F.R. § 404.1529(c)).

Importantly, "'[o]nly allegations beyond what is substantiated by medical evidence are to be subjected to a credibility analysis . . . [because requiring] plaintiff to fully substantiate [her] symptoms with medical evidence would be both in abrogation of the regulations and against their stated purpose." Martin v. Astrue, 2009 WL 2356118, at *10 (S.D.N.Y.

July 30, 2009) (citing Castillo v. Apfel, 1999 WL 147748, at *7 (S.D.N.Y. Mar. 18, 1999)).

b.  **The ALJ's Failure to Assess Plaintiff's Credibility**

In this case, plaintiff testified to a horrific family history and to experiencing ongoing stress as a result of living in the shelter system and being unemployed. (Tr. 375, 377, 386). In plaintiff's testimony, she also spoke about how this anxiety was exacerbated while living at New Providence, making her unable to travel via public transportation without the assistance of an escort. (Id. at 366-67). Indeed, during her testimony plaintiff specifically stated that she had been accompanied to the hearing that very day by an escort, who was sitting outside the hearing room. (Id. at 367). Plaintiff also spoke about her depression (id. at 382), claustrophobia (id. at 377), and the many medications she was taking. See supra at pp. 47-48. Additionally, the administrative record contains many notes from medical professionals relaying instances in which plaintiff self-reported symptoms. (See, e.g., Tr. 213 (Mendzies wrote that plaintiff reported feelings of depression); id. at 163 (Dr. Haley noted that plaintiff reported mood swings)).

95

Here, the ALJ did not engage in an explicit credibility analysis and failed to credit plaintiff's subjective reporting of her symptoms. Instead, after noting that plaintiff's MDIs could reasonably have caused her symptoms, the ALJ wrote that plaintiff's statements regarding the intensity, persistence, and pace of her symptoms could not be fully credited because they did not match the medical professionals' assessments of her mental condition, and concluded his credibility analysis there. (Id. at 19). The central purpose of the credibility analysis is to resolve conflicts between a plaintiff's reports of her symptoms and those of her medical professionals. See Peck, 2010 WL 3125950, at *4. In his decision, instead of resolving the arguable conflict, the ALJ merely stated that this conflict existed.

The ALJ's decision to proceed no further in the credibility analysis was error. In halting his inquiry, the ALJ never reached the required second stage of the analysis, and never actually addressed the conflicting reports. The ALJ did not even attempt to decide "whether [the] objective evidence, on its own, substantiate[d] the extent of [plaintiff's] alleged symptoms." Sanchez, 2010 WL 101501, at *14. The ALJ also failed to address the other pertinent criteria, found in 20 C.F.R. §§

404.1529(c)(3)   and   416.929(c)(3),   that   are   relevant   to
plaintiff's claims of anxiety and stress. Id.


Because   the   ALJ   failed   to   meaningfully   address   these
criteria, his analysis of plaintiff's credibility was inadequate
under   the   governing   regulations.   On   remand,   the   ALJ   should
proceed to the second step of the credibility analysis and take
care to resolve the conflict between plaintiff's reports of her
symptoms and the reports of her medical professionals in order
to properly determine plaintiff's RFC.


## CONCLUSION


As detailed above, there exist a number of evidentiary gaps
in   the   record,   and   ALJ   Feldmeier   committed   legal   error   in
several parts of his decision. The ALJ failed to sufficiently
develop   the   administrative   record   by   neglecting   to   obtain
medical   reports   from   New   Providence   and   by   not   seeking   out
additional   documents   from   Susan's   Place   and   Post   Graduate.   By
failing to acknowledge Mendzies' and the WeCARE team's reports
and by overlooking some of Dr. Monge's findings, the ALJ did not
adequately   consider   the   record   he   had   before   him.   The   ALJ   fell
short   in   properly   explaining   the   reasoning   behind   his   decisions

97

at steps three and four, and in his analysis of plaintiff's Residual Functional Capacity. Finally, the ALJ failed to undertake a proper credibility analysis of plaintiff.

Plaintiff argues that we should find in her favor, reverse the Commissioner's decision, and award her benefits. However, we believe that the ALJ, after properly analyzing the evidence in the record and remedying the legal errors made in his decision, could conceivably find that plaintiff was not disabled as defined by the Act during the relevant time period. Accordingly, we recommend that the case be remanded for further administrative consideration of plaintiff's disability benefits application. Thus, we recommend that plaintiff's motion be granted in part and that the Commissioner's motion be denied.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable J. Paul Oetken, Room 706, 40 Foley Square, New York, New York, 10007, and to the chambers of the undersigned, Room 1670, 500

Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: New York, New York
       September 20, 2013

RESPECTFULLY SUBMITTED,

_____
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

99

Copies of the foregoing Report and Recommendation have been sent this date to:

Leslie A. Ramirez-Fisher, Esq.
Assistant U.S. Attorney, S.D.N.Y.
86 Chambers Street, 3rd Floor
New York, New York 10007

Ms. Lauren Lewis
306 E. 171st Street
Apartment 5G
Bronx, New York 10457